**ELECTRICAL RESEARCH PRODUCTS, Inc., v. GROSS.**

**No. 9613.**

Circuit Court of Appeals, Ninth Circuit.

June 3, 1941.

---

GARRECHT, Circuit Judge, dissenting.

———◆———

R. E. Robertson, of Juneau, Alaska, and H. H. Breland and T. Brooke Price, both of New York City, for appellant.

J. A. Hellenthal and Frank H. Foster, both of Juneau, Alaska, for appellee.

Before GARRECHT and HEALY, Circuit Judges, and ST. SURE, District Judge.

HEALY, Circuit Judge.

Appellant sued to recover possession of motion picture sound equipment, which it had licensed to appellee, and to obtain damages for its detention. Appellee denied the asserted claim, set up various affirmative defenses, and counterclaimed for damages caused by appellant's removal of the property.[1] The jury returned a verdict in favor of appellee for $55,194.05, and from a judgment thereon this appeal was taken. On a former appeal a similar judgment was reversed. 9 Cir., 86 F.2d 925.

By two contracts dated March 28, 1929, appellant licensed appellee to use certain of its equipment in two of his theaters located in Juneau and Ketchikan, Alaska. The term of each license was ten years, and the aggregate rental was $21,000. The contracts contained the following important provisions:

"4. * * * Products [appellant] also agrees to make *periodical* inspection and minor adjustments in the Equipment after

[1] The equipment was taken into custody by the Marshal under the writ of replevin, and, upon the failure of appellee to post a redelivery bond, was turned over to appellant. The filing of the counterclaims for wrongful removal of the property is permitted by § 3696, Compiled Laws of Alaska, 1933, Act of June 6, 1900, c. 786, § 253, 31 Stat. 371.

it shall have been installed. Products may from time to time install such spare and renewal parts as may, in its opinion, be necessary to the satisfactory operation and maintenance of the Equipment.

* * *

"6. In addition to any other payments required to be made by the Exhibitor [appellee] hereunder, the Exhibitor agrees to pay Products throughout the term of the license hereby granted a service and inspection payment, payable weekly, which for the first two weeks of said term, shall be payable on the Saturday next succeeding the 'Service Day'[2] and thereafter throughout the balance of said term on each and every Saturday in advance. The amount of such payment shall be *in accordance with Products' regular schedule of such charges as from time to time established.* Under Products' present schedule, the service and inspection payment shall be $———— per week, which charge shall not be exceeded during the first two years of the period of said license and thereafter for the balance of the term of said license shall not exceed the sum of $———— per week.

* * *

"8. The Exhibitor agrees to pay to Products its list installation charges as from time to time established for any additional equipment, or spare or renewal parts, furnished or supplied by Products, upon delivery thereof. * * *" (Emphasis supplied).

The contract further provided that upon the failure of the licensee to pay any sum owed by him within five days after it should become due, appellant should have the right to terminate the contract and take possession of the equipment.

Subsequent to the execution of the above contracts the parties signed supplemental agreements, in the form of letters, dated September 4, 1929. Each letter refers to the original contract and states that: "This agreement was executed with the provision left blank relating to weekly service payments, in order that the amount thereof might be later determined. It is proposed that this provision of the agreement be now made definite, and that in order to give effect thereto, the above mentioned agreement be modified by striking out paragraph 6 thereof. (which, as above stated, was left blank as to the amount of the

charge) and inserting in lieu thereof the following: * * *"

Then follows the proposed new section 6, which is identical with the old, except for the last two sentences: "6. * * * The amount of such payment shall be in accordance with Products' regular schedule of such charges for theaters in Alaska as from time to time established. Under Products' present schedule, the service and inspection payment shall be $29.75 per week, which charge shall not be exceeded, provided, however, that the Exhibitor agrees to reimburse Products for any extra expense incurred by Products because of the use of airplane or other extraordinary means of transportation incurred in connection with emergency service visits."

The gist of the complaint is that appellant is entitled to possession of the property because of two distinct defaults on the part of appellee: (1) Failure to pay for the inspection and minor adjustment service from May 24, 1930 to March 7, 1931, amounting to $1,219.75; and (2) failure to pay for additional equipment furnished from May 20, 1930, to February 17, 1931, in the sum of $91.01.

The answer denies that appellee agreed to pay for the inspection service and denies that such service was ever rendered. It also denies that any additional equipment was ever furnished except such as was duly paid for upon delivery. It then sets up four affirmative defenses: (1) Duress in the execution of the supplemental agreements of September 4, 1929, relating to service charges, and in the payment of certain sums of money; (2) failure of appellant to render the service customarily performed under similar contracts in force in the United States; (3) payment for all additional equipment received; and (4) illegality of the contracts under the antitrust laws. A demurrer to the last-mentioned defense was sustained. The counterclaims allege, in effect, that the removal of the equipment was wrongful, and that appellee has suffered damages not only from the loss of the licenses, but from the loss of patronage as well.

Appellant contends that the evidence conclusively shows that appellee was in default as to both of the matters set forth in the complaint, and that the court erred in refusing to direct a verdict in its favor.

---

[2] The day on which installation should be completed and the equipment ready for use.

Obviously, if appellee was in default, either in the payment for service or for additional equipment, appellant was entitled to possession of the property.

With respect to the service charges, it is conceded that no payments were made by appellee for the period mentioned in the complaint. But appellee maintains that he was not obligated under either the original contracts or the supplemental agreements to pay such charges, and that, in any event, payment was excused by the failure of appellant to render the proper service.

The first of these propositions requires scant attention. The liability of appellee, under the original contracts, to pay $29.75 a week for inspections and minor adjustments was settled on the former appeal. 86 F.2d 925, 929. Hence, it is not necessary, so far as this issue is concerned, to consider the question of duress in the execution of the supplemental agreements.

The second proposition—that payment was excused by the failure of appellant to render the proper service—must be resolved in favor of appellee. As to the frequency of service, the contracts simply say that it shall be "periodical". In order to explain the meaning of this ambiguous term it was necessary to resort to parol evidence. Accordingly, appellee was permitted to show that appellant had numerous contracts in effect in the United States, and that its uniform practice in the States was to service the equipment about once a week for the first six months and bi-weekly thereafter. In addition, it was shown that appellant's engineers were available at all times for emergency service. The evidence further reveals that appellee was aware of this established practice on the part of appellant in rendering "periodical" service.

On the other hand, the record shows that appellant's engineers, leaving Seattle, called at appellee's theaters approximately once a month, and that appellant maintained no agent in Alaska for emergency service. Although in our view of the case the jury was not bound to find that this so-called usage furnished the standard of performance required by the contracts, it is plain that it might properly do so. In other words, the question whether appellee was in default, or whether his failure to pay the weekly service charge was excused by appellant's failure to perform, was a matter for the jury to decide.

At this point we digress for a moment to consider a ruling on evidence and an instruction given the jury on this phase of the case.

After appellee had, over the objection of appellant, introduced evidence of its practice of servicing theaters in the United States, appellant, in rebuttal, sought to prove by depositions of its agents, Gage and Levinson, that in the negotiations leading up to the execution of the contracts appellee was told that because of the distance to Alaska its service engineers would not be able to visit his theaters as often as they did those in the United States, and that they would make inspections and adjustments in his theaters approximately once a month. This evidence was excluded. And, consistently enough, the court instructed the jury as follows: " * * * If the plaintiff had in use a uniform contract, identical in terms so far as the printed portion was concerned, and had a usual and customary method in force at that time, in accordance with which service was rendered to its exhibitors and licensees generally throughout the country and for which the scheduled payments were made, then I instruct you that is the type and character of service that the plaintiff was required to render to the defendant under the contracts of March 28, 1929, and that the defendant was not required to pay plaintiff for such service charges unless such service was duly and faithfully rendered by the plaintiff." Inasmuch as the existence of the uniform contract and the prevalence of the usage were not in dispute, and since appellant made no pretense of furnishing service on a par with that in the States, the instruction was, in effect, a peremptory direction to find for appellee.

We think the court erred in giving this instruction and excluding the proffered evidence. And these errors alone are such as to require a reversal. As we have already seen, the contracts were ambiguous as to the frequency of the inspection and adjustment service, so that parol evidence was necessary to explain the intentions of the parties. But the court should not have restricted such evidence to the showing of appellant's business practice. A usage is not itself a legal rule, but is merely a practice in fact. Restatement, Contracts, vol. 1, § 245, Comment a. A usage known to both parties is not operative where either knows or should know that the other party has an intention inconsist-

ent with the usage. Restatement, supra, § 247 (c). And whether a party has reason to know that the other party intends his words or acts to be governed by a usage is a question of fact. Restatement, Contracts, supra, § 247, Comment c.

■ Here the evidence of appellant's business usage was not conclusive as to the meaning of the term "periodical". Moreover, the fact that in fixing the service charges the parties adopted the schedule in force in the United States does not conclusively indicate that the standard of service was to be the same as in the States. Appellee had no monopoly on the production of extrinsic evidence to explain the ambiguity in the contracts. Appellant was entitled to show, if it could, that the parties did not intend to abide by the usage prevalent in the United States. Restatement, Contracts, supra; see also, § 242; Buckbee v. Hohenadel, Jr., Co., 7 Cir., 224 F. 14, 26, 27, L.R.A.1916C, 1001, Ann.Cas. 1918B, 88; Cassin v. Stillman, Delehanty-Ferris Co., 185 App.Div. 63, 172 N.Y.S. 754, 757.

Returning to the contention that the evidence required a directed verdict for appellant, we consider the argument in relation to the alleged default of appellee in failing to pay for additional equipment. On this issue the position of appellee is that such equipment was fully paid for by virtue of large payments for inspection and adjustment service allegedly made under duress. Inasmuch as the charges for both service and equipment were entered on appellant's books in a single account, the amounts paid under duress must, it is said, be allocated to the payment of the equipment items. Appellant asserts that neither the answer nor the evidence is sufficient to spell out legal duress, and that, in any event, the sums so paid did not have the effect of cancelling out the charges for equipment.

We hold that the pleading was sufficient and the court did not err in overruling appellant's demurrer to the defense of duress. The point, we think, merits no discussion, so we turn to the evidence.

The duress is claimed to have occurred at a meeting between appellee and Gage, appellant's district sales representative, in December, 1929. Previously, in September, appellee, while in the States, had been notified by one of his Alaska agents that a bill had been received from appellant for inspection and adjustment service, and on the way back to Alaska he called on Gage in Seattle and took up the matter of service charges. Although the equipment had been installed and placed in operation in May and June, 1929, appellee had received no bill for service until September; nor had he made any payments for service. At this meeting he was induced to sign the supplemental agreements dated September 4, 1929, and to make a payment of about $2,000 on "accrued" service charges.

According to appellee, he had an argument with Gage, lasting two hours, in which he strenuously protested the payment for service and the signing of the supplemental agreements. He told Gage he had never-signed for service, and had never received any because the company had not wished to supply it. And when he refused to pay for service, Gage replied that he (Gage) could not help himself and had to do as he was told. He said, "I can't help you any. I got here a letter from the company and they write and want you to sign it; you have to sign the letter. If you don't sign it I will tear your machines out."

Appellee further testified that at the time of this interview his business was good; there was then no other satisfactory sound equipment on the market, and it would have taken five or six months to get equipment of any kind; he could not go back to silent pictures because they were no longer being made; he was obligated under booking contracts for $80,000 worth of films; and if his machines were taken out he would be ruined. He stated that he would not have signed the agreements or paid over the money had it not been for the threat of Gage to take out the equipment.

Cawthorne, an agent of appellee who was also present at the meeting, testified that appellee said to Gage: "Now, you know I have no service charges. You read the contract [the original contracts of March 28, 1929]. You said there would be no service charges. I had to furnish my own man. I know about it and Cawthorne knows about it, because we were both there and you took a lot of credit for getting the contract through without any service charges." Gage replied that this was all "conversation". Appellee said that the demand was ridiculous; that he had not received the service, was not obligated to pay for it and would not do so. When the witness referred to the letters as "contracts",

Gage rejoined, "This is for service, it has got nothing to do with your contract." Finally after considerable argument he said, "There is no use, you either sign them or we are going up there and tear your equipment out just like the telephone man would tear out your telephone if you didn't pay your telephone bill". Thereupon the witness and appellee held a conference, and, knowing that if the threat were carried out it would be a death knell to the business, decided the best thing they could do was to sign and pay. Before the contracts were signed, however, Gage explained to appellee that appellant had not been in a position to render service in the past, but that the situation had now changed; he said they were putting in other machines and would be having a man in Alaska.

■ We think this evidence was sufficient proof of duress to go to the jury. True, as appellant asserts, "a threat to bring a civil action or to resort to remedies given by the contract is not such duress as to justify rescission of a transaction induced thereby, even though there is no legal right to enforce the claim, provided the threat is made in good faith; that is, in the belief that a possible cause of action exists." Williston on Contracts, Rev.Ed., vol. 5, § 1606. Here, however, there was ample evidence tending to show that the appellant's threats were not made in good faith. For example, it appears from the above testimony of Cawthorne that at the time appellee was forced to sign the supplemental agreements and pay for back service appellant was aware that proper service had not been rendered. Appellee, it is true, was already bound by the original contracts to pay the service charges, so that the signing of the supplemental agreements did not enlarge his contractual liability. But he was not bound to pay for service which had not been performed. A jury, we think would be justified in finding that such payments were made at a time when appellee was precluded, by the wrongful threats of appellant, from exercising his free will and judgment. Restatement, Contracts, vol. 2, §§ 492, 493; 17 Am.Jur., §§ 7, 11.

The court instructed the jury that if it should find that appellant did not perform the proper service, and that it received from appellee under duress a sum of money in excess of any balance that might otherwise be due for spare and renewal parts, then appellant had no right to forfeit the contracts because of the failure of appellee to pay for such parts.

■ We find no error here. It appears from appellant's books of account that the charges for service and those for equipment were carried in the same account—one for each theater—showing a general balance. As stated by appellant's own witness, a certified public accountant, appellant's books showed a "straight account for parts and service charges". The witness also testified that if the service charge entries were erroneous because of appellant's failure to render the service, appellant's ledgers would show a credit balance in favor of appellee of about $1,600 for the Juneau theater and about $1,500 for the Ketchikan. Since we are not here dealing with mutual debts as such but with disputed items carried in the same account, the authorities cited by appellant to the effect that mutual debts do not automatically cancel each other, are not in point.

■ Appellant adverts to the statement in the previous opinion in this case that "The evidence does not show a wrongful taking or removal of the equipment. On the contrary, it shows that such taking and removal were lawful and proper" (86 F.2d page 930). And that "It was shown by uncontradicted evidence that appellee owed appellant $91.01 for additional equipment * * * which amount had become due and payable more than one week prior to the commencement of this action, and, at that time and at the time of trial, was wholly unpaid" (86 F.2d page 930). These pronouncements are said to be the law of the case. But the record on the former appeal did not contain appellant's books of account; nor does the opinion contain any discussion of the subject of duress, except insofar as it formed the basis of appellee's counterclaims. Under these circumstances the former decision is not controlling.

We conclude on this branch of the case that the record does not conclusively establish a default on the part of appellee, either as to the service charges or the items of additional equipment; therefore the court did not err in refusing to direct a verdict in favor of appellant. As we have seen, however, the court did commit certain errors which necessitate a reversal.

Appellant also assails the court's instructions on the measure of damages. Under them the jury was permitted to allow appellee not only the value of his unexpired

licenses, but also the amount of lost profits occasioned by the removal of the property.[3] Appellant excepted to the latter item on the ground that "lost profits themselves, if any were proven under the evidence, are too remote, speculative and uncertain. * * *"

We think this was a proper case for the recovery of lost profits. Ordinarily, it is true, the measure of damages recoverable for the loss of a license would be the value of the license. Sedgwick on Damages, 9th Ed., vol. 1, § 78. But where the licensee has an established business, and can prove with reasonable certainty that the loss of the license directly resulted in a loss of profits reasonably expected to be earned in such business, then he is entitled to recover the lost profits. Indeed, this principle is too well established to warrant extended discussion. See Sedgwick on Damages, supra, § 182; Central Coal & Coke Co. v. Hartman, 8 Cir., 111 F. 96; 15 Am.Jur., § 157.

The court's instructions on this item of damages consume several pages of the record. They cover many phases of the problem, and appear fully to safeguard the rights of appellant. The record includes proof of the average monthly profit of each of appellee's theaters for the two year period when appellant's equipment was in use, and the average losses sustained after the removal of such property and while appellee was using other equipment said to be inferior. We think the issue of lost profits was properly sent to the jury, and we find no error in the instructions.

Here again it is urged that the law of the case has been violated. Appellant refers to the discussion of the measure of damages, 86 F.2d page 930. Obviously, the discussion is dictum. And if it be construed as denying the right to recover lost profits in a case of this kind, we think it was ill-advised and should not be followed.

We find no error in the exclusion of the testimony of the witness Ward as to the expense of servicing theaters in Alaska. Clearly, such evidence was irrelevant.

The judgment is reversed and a new trial granted.

GARRECHT, Circuit Judge (dissenting).

The major issue in dispute here is to determine what service appellant agreed to furnish as included in the word "periodical" as used in the paragraph of the contracts, reading as follows: "4. * * * Products [appellant] also agrees to make periodical inspection and minor adjustments in the Equipment after it shall have been installed. * * *"

Appellant's General Service Manager testified that at the time the contract was entered into appellant had a standard form of contract and that the one here in suit was one of those standard contracts; that the provision relating to service was identical in all the contracts; also, that in 1929 and 1930 the appellant furnished a regular system of service in the States, for which it charged $29.75 per week. On cross-examination appellant's Vice-President gave the details of this system. He testified: " * * * In the beginning for the first six months of operation in 1929 and 1930 we serviced once a week for the first six months; when I say a week it might have been eight days one time and six another, but approximately every ten days; the second six months and thereafter, approximately every two weeks with the exception of very large de luxe houses, with a seating capacity of upward of 1,500 seats of which there were about 150 in the United States, which were serviced every week; plaintiff also furnished a service man day or night on call whenever the theatre was running; the operator had nothing to do if anything was wrong except to call the office and get a service man right away."

The contracts were entered into on March 28, 1929. At that time appellant was informed of the services usually rendered under contracts such as this. Moreover, the letter from appellant to appellee from the New York office, dated November 23, 1928, makes it clear that the appellant agreed to furnish the same service for appellee's theaters in Alaska that it was furnishing in the States; that the only difference might be that for this service the charge might be higher in Alaska, but

---

[3] The verdict embraced the following items:

| | |
|---|---|
| Value of Juneau license..$ | 8,788.50 |
| Damage to Juneau business (loss of profits) .. | 13,670.85 |
| Value of Ketchikan license | 8,788.50 |
| Damage to Ketchikan business (loss of profits) ... | 23,947.20 |
| Total damages ....$ | 55,194.05 |

the service was to be the same. On this point the letter recites:

"* * * In order to come to a mutual understanding I feel that you should be advised that certain expenses over and above those included in the domestic prices mentioned in the contract that you have already signed will be billed to you separately.

* * * *

"3. A weekly service charge somewhat in excess of the one in the States. We will not be able to determine the exact amount of this charge until our engineer can study the local situation. Our desire is to give you service equal to that given to the theaters in this country and at all times to keep this charge at a minimum."

Appellant thus proved that at the time the contract was entered into the phrase "make periodical inspection" had a definite, well-known meaning to the trade, which, in addition, was being particularly elucidated by the contracting parties.

Appellant now seeks to contradict these writings and to vary the terms of the written contract by introducing in evidence the depositions of two of its agents to the effect that prior to the signing of the contract there was still a different understanding arrived at in an alleged telephone conversation, admittedly occurring before the documents were signed and which is not embodied therein.

That it was the purpose of appellant, by means of these depositions, to change the ordinary accepted meaning of the written contract by reference to an alleged conversation is apparent from a reading of the rejected deposition of Nathan Levinson; in it, among other things, he said: "* * * I told Mr. Gross, as I remember it, that at no time did I like the idea of Mr. Gage having sold him on the idea of installing sound equipment in his theaters, because of the almost impossible situation of furnishing proper service. * * *" Evidently, appellant came to realize that it would be difficult to furnish the "proper service" it had agreed to, and was anxious to be relieved from its obligation.

Further, Levinson goes on to say that he discussed this situation with appellee at some length on the telephone and that he further stated specifically "that in any emergency an engineer would be sent by airplane from Seattle, provided the planes could get through, and provided Mr. Gross would stand the expense involved in such emergency calls." This would be an additional parol amendment to the contract.

The District Court held that the offer of these depositions was an attempt to vary the written agreement by parol evidence which was not only contrary to law but at variance with its very terms, as appears from the following paragraph:

"Entire understanding.

"20. The parties hereto expressly stipulate that this agreement as herein set forth contains the entire understanding of the respective parties with reference to the subject matter hereof, and that there is no other understanding, agreement or representation, express or implied, in any way limiting, extending, defining or otherwise relating to the provisions hereof or any of the matters to which the present agreement relates. No agent or employee of [Electrical Research Products, Inc.] is authorized to alter or modify this agreement in any way unless such alteration or modification shall be approved in writing by the President or a Vice President of [Electrical Research Products, Inc.] or by such representative as may from time to time be designated in writing by either of such officers. No waiver by either party, whether express or implied, of any of the provisions of this agreement shall be construed as constituting a waiver of any other provision or provisions of this agreement or as estopping either party from its right to enforce any provision or all provisions hereof."

The excluded depositions are vague and indefinite, particularly as to the date on which the alleged conversation referred to occurred. It was said to have taken place some time in the summer or fall of 1928, which, in any event, was prior to the execution of the contract, and under the law all matters theretofore agreed to should have been reduced to writing and embodied in the contract. This applies also to the further alleged agreement that appellee in case of emergency would be required to pay expenses of transporting an engineer by plane from Seattle. Moreover, the purport of any such verbal understanding as alleged in the depositions is contradicted by the letter written from the New York office by appellant's manager, of date November 23, 1928, already referred to.

310

Further, appellant insists that the original contracts were amended by supplemental contracts of September 4, 1929. Appellee contends these were exacted under duress, which seems to have been the view of the jury. But however that may be, it is significant that these amended contracts fixed the schedule charge for service and inspection at $29.75 per week, exactly the same as the testimony shows was the charge in the States.

In my opinion there was no error in excluding this evidence contained in the depositions or in the giving of the instruction condemned in the majority opinion.

This case already has been tried twice in the District Court; two juries have decided in favor of appellee. It has been heard in this court twice. Litigation should never be protracted where, with due regard to the rights of parties, it can possibly be avoided. "Interest reipublicae ut sit finis litium" is a maxim so old that its origin is hidden in remote antiquity.

The judgment of the District Court should be affirmed.