COASTAL CLUB, Inc., v. SHELL OIL CO., Inc.

Civil Action No. 632.

District Court, W. D. Louisiana, Lake Charles Division.

Sept. 22, 1943.

820

See, also, 45 F.Supp. 859.

LeDoux R. Provosty, of Alexandria, La., for plaintiff.

George C. Schoenberger, Jr., of Houston, Tex., for defendant.

PORTERIE, District Judge.

Omitting the purely argumentative parts, we quote practically verbatim the statement of the case as drafted by the counsel of the defendant company.

Plaintiff seeks the cancellation of an oil, gas and mineral lease held by defendant on its land, situated in what is known as the South East Extension of the Chalkley Field, or South East Chalkley Extension in Cameron Parish, Louisiana, and, in the alternative, damages in the sum of $36,000. Plaintiff prays likewise for attorney's fees in the sum of $2,000. Both the claim for cancellation and that for damages are based on an alleged breach of the implied covenants of the lease. Two wells have been drilled on plaintiff's land, Coastal Club No. 1, an oil well completed in June, 1940, in the W sand and Coastal Club No. 2, a gas well completed May 16, 1941, in the T sand. Plaintiff claims that another well should have been drilled on its land to the W sand on the 40-acre tract just south of that on which Coastal Club No. 1 is situated (referred to in this case as Coastal Club No. 3 and also as hypothetical or conjectural Coastal Club No. 3) and that the failure and refusal of defend-

ant-lessee to drill the additional well was a breach of the implied obligations of the lease and entitles the plaintiff to the cancellation sought. Plaintiff admits that Coastal Club No. 1 is producing oil in paying quantities and concedes that defendant is entitled to retain the lease as to 5 acres around that well; but contends that Coastal Club No. 2, not being connected to a pipe line and having no available market for its gas, cannot be considered as producing gas in paying quantities although plaintiff has received royalties from well No. 2 averaging $70 per month to the time of the trial for gas used in field operations. Consequently, plaintiff contends that defendant is not entitled to retain any acreage around well No. 2.

The lease in question was granted by The Coastal Club, Inc. (plaintiff herein), to Walter C. Peters, April 11, 1935, and was assigned by Peters to Shell Oil Company, Incorporated (defendant herein). It originally covered 6,000 acres of land; but in February, 1942, defendant filed for record a release of all the leased premises except 240 acres. Thereafter, during the pendency of this suit, defendant filed for record a further release whereby it released all the leased acreage except 80 acres, that is NW ¼ of NW ¼, Section 27, Township 12 South, Range 6 West, being the governmental subdivision of 40 acres on which Coastal Club No. 1 is located and NE ¼ of SE ¼, Section 28, same township and range, being the governmental subdivision of 40 acres on which Coastal Club No. 2 is located. Plaintiff takes the position that the lease does not permit of partial surrender and that, when defendant put of record the two partial releases, defendant abandoned the lease and terminated it, except as to 5 acres around Coastal Club No. 1. In the alternative, plaintiff prays that if the partial surrenders did not operate as an abandonment of the lease, plaintiff is entitled to damages in the sum of $36,000 for failure to drill the additional well, hypothetical Coastal Club No. 3.

There is another point made by plaintiff, to-wit: that Coastal Club No. 1 is not in the center of the 40-acre tract retained by defendant and in no event should defendant be permitted to keep more of the retained acreage than that which would be included in a block of 40 acres shaped as nearly to a square as possible with Coastal Club No. 1 in the center.

*We believe that the real issue between plaintiff and defendant is whether or not defendant has adequately developed the premises.*

The position of the defendant is that (a) the premises have been adequately developed and there has been no breach of any express or implied covenants of the lease, and, hence, no bases for any relief; (b) the question of whether or not the lease permits of partial surrender is immaterial to the decision of the case; but in any event partial surrender is not prohibited by the lease after the delay rental payment period is passed; (c) should the court decide there has been a failure to develop adequately, the defendant should be permitted nevertheless to hold the two tracts not surrendered, because they correspond to the field spacing, as required under existing governmental regulations; (d) in no event should defendant be given less than 5 acres around each well; (e) plaintiff is not entitled to damages; and (f) plaintiff is not entitled to attorney's fees even if cancellation be decreed.

We asked that the briefs submitted to the court be subdivided into four parts—the statement of the case, the discussion of the facts, the findings of fact, and the conclusions of law. Both briefs were so formulated and proved to be of great help to the court.

If defendant has adequately developed, then the partial surrenders did not damage plaintiff and they constituted simply an expression by defendant that it felt the released acreage would not support a well and that it did not intend to drill on the released acreage, nor did it want to stand in the way of plaintiff trying to find some other operator to drill. If there has been adequate development, there has been no breach of the obligations of the lease and hence no damage done to plaintiff by the defendant and, accordingly, there is no occasion for the court to inquire into whether or not the arrangement of the retained acreage around the wells is scientific or desirable.

We shall now discuss the dominant facts, established by the clear preponderance of the evidence.

The eight wells that have already been drilled and that are now producing in the field are producing all the recoverable oil from the reservoir. This was supported by the evidence of the experts on both

822

sides, and is pleaded by both parties. From the established premise that the wells in existence are capable of producing all of the oil in the field there follows indubitably the conclusion that the field as a whole has been adequately developed. Any additional wells would be unnecessary wells. In the recent case of Hunter Co. v. Mc-Hugh, Commissioner of Conservation, 202 La. 97, 11 So.2d 495, 510, the court said: "Any well which will not increase materially the total ultimate recovery from the gas pool is an unnecessary well. The drilling and completion of every unnecessary well invariably threatens to cause physical waste of gas and results in an inefficient and uneconomic drainage area for such well."

The next important and dominant question is whether or not the distribution of the development is such as to give plaintiff its fair share of the reserve.

The following tabulation taken from defendant's brief (checked by the court against the transcript and found to be true) shows the percentage of the total productive acreage owned by the Coastal Club:

| "Name | Total Productive Acreage | Total Coastal Club Productive Acreage | Percent of Total |
|---|---|---|---|
| Bates | 700 (P. 71) | 80 (P. 74 and 77) | 11.4 (Ex. D. 25 and P. 226) |
| Collett | 695 (P. 166) | 85 (P. 166) | 12.2 (Ex. D. 25 and P. 226) |
| Burpee | 605 (P. 220) | 70.4 (P. 220) | 11.6 (P. 220) |
| Torrey | 556 (P. 300, 301) | 68 (P. 301) | 12.23 (P. 332) |
| Craft | 605 (P. 373) | 70.4 (P. 374) | 11.6 (P. 374)" |

From this tabulation it is proved that the plaintiff has somewhere between 11.4% and 12.23% of the total productive acreage. Since there are eight producing wells in the field, it is obvious, arithmetically, that the plaintiff has 12.5% of the total number of wells. The facts from the witness stand are that Coastal Club No. 1 well is located high on the structure and is even now producing more than 12.5% of the total field production, as one of the other wells is producing less than its allowable. Because of its high structural position, as the water encroaches and the other wells go out, Coastal Club No. 1 will increase in percentage of total production from the field.

The next point to determine, in sequence, is to find out the percentage of total field production that will ultimately accrue to

the plaintiff from well No. 1, if the present conditions are left undisturbed.

We have checked the evidence and must find the following to be established preponderantly, quoting from the brief of counsel for the defendant: "A further examination of the production and reserve figures emphasizes this. Plaintiff's expert, Bates, testified solely for the purpose of proving the reserves of oil in place available for recovery by drilling (P. 78 and 95). He gave the reserves based on several hypotheses as to recovery per acre foot. Using 500 barrels per acre foot as a recovery factor, the total recoverable reserve for the field was placed by him at 4,200,000 (P. 72, lines 16–20) and the total reserves for Coastal Club lands at 520,000 (P. 54, line 20). Using 600 barrels per acre foot, the total reserves are estimated at 5,040,000 barrels (P. 72, line 22) and Coastal Club reserves 624,000 (P. 58, lines 9–11). Using 750 barrels per acre foot he calculated the total reserves at 6,300,000 barrels (P. 72, line 23) and the Coastal Club reserves at 780,000 (P. 59, line 1). Simple arithmetic will show that in each instance the percentage of the whole is 12.4%. This is a significant figure. It forestalls any argument that the acreage figures are deceptive. Thus we find that the Coastal Club lease, having only 11.4% to 12.23% of the productive acreage and only 12.4% of the total reserves originally available for production, will actually produce as much as 15.65% to 16% of the total ultimate production from the field. These figures certainly do not show that Coastal Club has any cause to complain of the way the field has been developed and operated."

From an examination and study of the testimony of Collett and Bates, experts for the plaintiff, and of Burpee, Craft and Torrey, experts for the defendant, it would seem that the Coastal Club lease originally had in place recoverable reserves of 624,000 barrels. But since the same expert

for plaintiff, Collett, calculated that between 849,000 to 870,000 barrels would be produced from Coastal Club No. 1, under existing conditions, the proof has been placed in the record by the plaintiff that Coastal Club lease will produce approximately 200,000 barrels of oil over and above that which the geological expert stated originally was in place available for production.

In the case of Louisiana Gas Lands v. Burrow, 197 La. 275, 1 So.2d 518, 521, the court said: "It would seem to be clear that plaintiff is entitled to the benefit of production from its land, which production should be equal to the proportion of the total production of gas from the field, to be determined by the percentage the eighty acres of land owned by plaintiff bears to the total acreage embraced in the field."

█ The conclusion we have just made, in our opinion, leaves nothing further to consider in plaintiff's case, for patently, plaintiff will receive at least its fair share of production. Therefore, there can be no damages on an alleged breach of the expressed or implied covenant of the lease to fairly and legally exploit the acreage leased. There has been adequate development and that ends the case of plaintiff.

However, as will be shown in the findings of fact and conclusions of law, we have not stopped with this conclusion, but have ruled on all issues raised at the trial.

Paragraph 8 of the oil, gas and mineral lease at issue reads, in part, as follows: "In case of cancellation or termination of this lease for any cause, Lessee shall have the right to retain under the terms hereof five acres of land around each well producing, being worked on, or drilling hereunder, such tract to be designated by Lessee in as near a square form as practicable. * * *"

██ We determine that the lease contract is indivisible, but that it has not been abandoned. But, we have the words: "In case of * * * termination of this lease for any cause"; this suit, we rule, is a cause for the termination of the lease. We allow, therefore, only five acres of land at each of the two wells, in the shape of a square, the northern and southern boundaries of which are to run east and west, and the eastern and western boundaries of which are to run north and south —the square being so placed that its diagonals will intersect at the well pipe.

Established by the clear preponderance of the evidence, the Court finds the following to be the facts in this case:

1. This controversy involves the South East Extension of the Chalkley Field, Cameron Parish, Louisiana (P. 8, line 23, P. 104, line 12, P. 129, line 17, P. 128, line 20, P. 134, lines 21 and 22).

2. The South East Extension is a separate reservoir, separated by a fault from the main Chalkley Field (P. 27, line 21 et seq., and P. 131).

3. The stratum designated as the W sand is the only oil producing sand in the South East Extension (P. 38, line 18 et seq. and Bates 3 and 4).

4. There are two wells drilled on the land of the plaintiff, namely, Coastal Club No. 1, an oil well drilled to the W sand in the NW/4 of NW/4 of Section 27, T–12–S, R–6–W (P. 16, Exhibit Defendant 12), and Coastal Club No. 2, a gas well drilled to the T sand in NE/4 of SE/4 of Section 28, same township and range (P. 16, line 20, Exhibit Defendant 12).

5. Plaintiff's experts claim one more well should have been drilled (referred to as Coastal Club No. 3) to W sand in SW/4 of NW/4 of Section 27, T–12–S, R–6–W (P. 47–50 and P. 145).

6. Plaintiff's expert admits that one more well is not necessary to drain substantially all of the oil recoverable from the W sand (P. 103 and P. 104).

7. There are eight wells now producing from the W sand (P. 11, line 15 and Defendant 25, P. 23, line 22), one of which is on plaintiff's land known as Coastal Club No. 1 (P. 23, line 22, P. 228, line 12).

8. Those eight wells will produce all the recoverable oil from the field (P. 56, line 14, P. 103, lines 10-22, P. 242, line 24, P. 300, line 21, P. 366, line 3).

9. The productive acreage of the Coastal Club lease is from 11.4% to 12.23% of the total productive acreage in the field (P. 71, 74, 77, 166, 220, 226, 300, 301, 373, 374, and Exhibit Defendant 25).

10. The total reserves of recoverable oil originally under the Coastal Club land in the field was 12.4% of the total in the field (P. 54, 59 and 72).

11. Under existing conditions in the field the Coastal Club lease will produce from

15.6% to 16% of the field total (P. 162, 164, 185, 243, 312, 328, 334, and 373 and P. 2 Collett's supplemental testimony).

12. Based on the estimates of production given by plaintiff's witnesses, Coastal Club lease had original reserves of from 624,000 to 686,000 barrels of oil and, under existing conditions, will produce 849,000 to 870,000 barrels—an excess of 184,000 to 185,000 barrels (P. 59 for reserves; P. 164 and 185 and P. 2 Collett's supplemental testimony for production).

13. Based on defendant's experts' estimates of total production and the difference between the percentage of production and the percentage of reserve, the excess will be between 70,000 to 80,000 barrels (3½% to 4% of 2,000,000 barrels).

14. February 1, 1942, was the hypothetical completion date of Coastal Club No. 3 a prudent operator would have adopted in considering the probable recoveries from the hypothetical well (P. 246–250, 314–317).

15. A prudent operator would have considered that Coastal Club No. 3 would have been offset on both sides in considering the probable recoveries from the hypothetical Coastal Club No. 3 (P. 107, 108 and 113, line 18).

16. On the basis of the agreed average drilling costs and the average of the agreed canal costs, it would have taken 91,000 to 91,250 barrels of oil for an operator to break even with no profit on the drilling of a well in South East Chalkley Extension (P. 265, 281).

17. Coastal Club No. 3 completed February 1, 1942, with two offsets would not have produced enough oil to pay the costs of drilling, equipping and operating (P. 252, 317, 328, 377, 380).

18. The Coastal Club No. 3 completed September 1, 1941, with two offsets would have produced just enough oil to be on the border line of paying the cost of drilling, equipping and operating with no reasonable expectation of profit (P. 268, 330, 378, 380).

19. If Coastal Club No. 3 had been drilled with two offsets, the Coastal Club lease would have produced less total oil than it will under existing conditions (P. 328, 356, 393).

20. If Coastal Club No. 3 had been drilled with only one offset, either on the east or the west and none on the other side, the Coastal Club lease would have produced less total oil than it will under existing conditions (P. 356 and 357).

21. The opinions of the experts as to the future performance of a field approach scientific exactness when based on information available later in the life of the field (P. 382). The opinions of defendant's experts were based on such information and are accepted by the court as near scientific exactness (P. 382).

22. The effective oil producing sand body is uniform over the field (P. 68–70, 387 and 388).

23. A prudent operator would not have drilled Coastal Club No. 3 as of either September 1, 1941, or February 1, 1942 (P. 291, 332, 393).

24. Defendant has not abandoned the lease, but is now operating it, producing oil and gas.

25. It was not defendant's intention to abandon the lease.

26. To the time of the trial plaintiff had received royalties averaging $70 per month on account of gas and distillate produced from Coastal Club No. 2 (P. 206, line 12).

27. The position of Coastal Club No. 1 in the SW/4 of NW/4 of Section 27 and the position of Coastal Club No. 2 in NE/4 of SE/4 of Section 28 correspond to the field pattern (Defendant No. 12).

Our conclusions of law are:

1. Defendant has met all the express obligations of the lease.

2. The complaint here is based on a claimed breach of implied covenants of the lease.

3. The duty of an oil and gas lessee under the implied covenants of the lease is to operate the premises to the mutual interest of lessor and lessee.

4. A well that will not add materially to the total production from the reservoir is an unnecessary well.

5. Where lessor has 11.4% to 12.23% of the productive acreage and, under present development of the field, its lease will produce 15.65% to 16% of the total oil from the field, and wells now drilled are capable of producing all the oil, its lease has been adequately developed and prudently operated.

6. Where lessor's land originally had 12.4% of total reserves of oil in the field and, under present development, it will

produce 15.65% to 16% of the field total of oil, and wells now drilled are capable of producing all the oil, its lease has been adequately developed and prudently operated.

7. Where plaintiff's proof shows that its lease will produce about 184,000 to 185,000 barrels more than plaintiff's proof showed that it originally had in place, plaintiff has failed to carry the burden of proof to sustain a claim for cancellation or damages based on alleged breach of implied covenants of the lease.

8. A prudent operator, operating the entire field, must consider the proportionate production by leases in determining on development and operation program.

9. Plaintiff is not entitled to the production of the exact oil from under its land even if it could be identified.

10. Under the implied obligation to develop, a lessee is not required to drill where the available information indicates a strong probability that the well will not pay out.

11. The implied covenant to develop does not require the lessee to drill where the wells already drilled will produce all the oil in the field and will give lessor its fair share of the total production.

12. The evidence in this case shows that there has been no breach of any of the express or implied obligations under the lease held by defendant covering plaintiff's land.

13. The partial surrenders filed by defendant did not constitute an abandonment of the lease.

14. Even though the lease is indivisible and prohibits partial surrenders, the filing for record by defendant of instruments purporting to surrender a part of the premises did not abandon the lease; the only result being that the partial surrenders were ineffective.

15. Coastal Club No. 2 must be considered as producing gas and distillate in paying quantities to the time of the trial, plaintiff having received royalties averaging $70.00 per month from these products.

16. The proof shows affirmatively lessor has suffered no damage. Obviously, the claim for attorney's fees falls. Besides, there is no law to support them in this case.

17. Defendant is entitled to retain five acres around each well, for reason given above and to be surveyed as aforedescribed.

Judgment in consonance with the above opinion will be signed upon presentation.