**COASTAL CLUB, Inc., v. SHELL OIL CO., Inc.**

**Civ. A. No. 632.**

District Court, W. D. Louisiana,
Lake Charles Division.

July 20, 1944.

On Motion for New Trial Sept. 13, 1944.

LeDoux R. Provosty, of Alexandria, La., for plaintiff.

George C. Schoenberger, Jr. and R. H. Whilden, both of Houston, Tex., for defendant.

PORTERIE, District Judge.

Our opinion in this case at 51 F.Supp. 819, as well as the opinion of the Circuit Court, 5 Cir., at 141 F.2d 382, are made a part of this opinion.

On the motion by plaintiff for a rehearing, 142 F.2d 245, the Circuit Court said:

"Movant is in error in its assumption that the opinion was intended to, or did, have any effect other than an adjudication that the judgment was wrong and ought to be reversed and sent back for further proceedings not inconsistent with it, and when the judgment is entered on the opinion, it will be so ordered. The statement in the opinion * * *:

" 'As the matter stands, therefore, * * * the situation is as if no partial releases had been executed and placed of record' had reference to the situation as it existed at the entry of the judgment appealed from. It was not intended to, it did not, prevent the appellee from making the releases effectual by accepting them. The motion is denied."

We quote the full entry of the minutes of May 12, 1944, in this case:

"Hearing was called by the court in this case on the matter of the remand. Mr. Provosty, on behalf of plaintiff, moved the court to file a supplemental petition, which petition he read in court. Objection to the filing of the supplemental petition was made by Mr. Schoenberger, who read a prepared judgment and asked that it be filed.

"The court stated that the filing of the supplemental petition was now at issue before the court as well as the signing of the prepared judgment as read, and arguments were heard.

"The court ordered the filing of the supplemental petition, together with attached letter from Shell Oil Company, Inc., to Coastal Club, Inc., dated May 5, 1944, and photostatic copy of instrument of revocation executed by Shell Oil Company on March 29, 1944, said documents being offered in evidence with the supplemental petition, and order was signed in open court allowing the filing.

"The court further ordered the blank, unsigned judgment as prepared by defendant, filed, and took the case under advisement, briefs to be filed by counsel."

The per curiam is dated May 3, 1944; on May 5, 1944, a letter was sent from the Shell Oil Company, Incorporated, to the plaintiff showing that an instrument of revocation had been executed since March 29, 1944, and that the instrument of revocation had been mailed for recordation in the parish of the situs of the property since March 31, 1944, all of this having been done while this case was extant on rehearing. The case is, we think, extant now; and in the district court, too.

The plaintiff seeks a declaration from this court that the attempted revocation of the surrenders is invalid and violative of the mandate, main and per curiam, of the Circuit Court; and that, additionally, the pleadings and the law entitle it now to a judgment leaving leased to the defendant

only 40 acres around each of Coastal Club wells No. 1 and No. 2.

When the legal import of a findings of fact by the appellate court discloses that some of the facts were given a fundamentally different meaning from that which was intended by the court of first instance, because of the poor language of the lower court, it becomes the conscientious duty of the lower court to say so. This obligation is due, not only as a matter of justice to the litigants, but, also, in order to preserve the purity of and to make more exact the jurisprudence.

Now, in order to be frank, first of all with the litigants, and secondly, with the members of the appellate court, there are explanations to be made as to what was our mental concept as to some of the language:

In Item 24, we say [51 F.Supp. 824]: "Defendant has not abandoned the lease, but is now operating it, producing oil and gas." When we use the word "abandoned" we are not giving it its legal significance as developed by the jurisprudence, but we mean that the Shell Company has not gotten off the premises entirely; that it is "producing oil and gas" at two wells, one of oil, one of gas.

In Item 25 of the finding of facts, we say: "It was not defendant's intention to abandon the lease." We did not mean here that legally defendant had not forfeited the lease. We meant that defendant was physically present, operating two wells, and had not totally abandoned the lease. The next Item, 26, in immediate sequence, shows what we had in mind.

Our judgment was predicated on the fact that we thought the jurisprudence considered the release of acreage in the face of an indivisible contract a *forefeiture* of the contract, with the consequent result that the defendant company under the contract should retain but five acres at each one of the two wells.

There are two items in the conclusions of law as to which we should plainly and frankly confess what our real meaning was. What did we intend to convey by our words? We shall not do this with the idea of unfavorable criticism, direct or implied, of what the Circuit Court or expert advocates might construe the meaning to be.

In Item 13, we said: "The partial surrenders filed by defendant did not constitute an abandonment of the lease." Our use of the language was to indicate that the defendant company was at the very time of the utterance of the statement and for a long time previously operating the two wells, getting oil out of one, gas out of the other, and though these releases had been filed by it, it had not, in the common acceptance of the term, abandoned the total lease, but was remaining physically on part of the total premises. If the contract were indivisible, the execution of these partial releases was a forfeiture of the contract. That is what we had in mind when we said: "This suit," (the two releases are pleaded formally) "we rule, is a cause for the termination of the lease." 51 F.Supp. 823.

Likewise, in Item 14, when we said: "Even though the lease is indivisible and prohibits partial surrenders, the filing for record by defendant of instruments purporting to surrender a part of the premises did not abandon the lease; the only result being that the partial surrenders were ineffective", we meant that the partial surrenders were not the equivalent of a total surrender, and that the defendant company had the right to remain on the premises with the view of continued operation of the two wells, with five acres around each well.

The thoroughly conversant legal mind imparts to the words a significance that was never in the ill-informed mind of the court of first instance. We never had in mind that the partial surrenders meant nothing, because they were not accepted by the plaintiff, and therefore could not become the *cause* for forfeiture of the contract.

An immediate sequence comes in Item 15 and reads: "Coastal Club No. 2 must be considered as producing gas and distillate in paying quantities to the time of the trial, plaintiff having received royalties averaging $70.00 per month from these products", confirming by context the meaning in the court's mind of what it had just given to the language in Items 13 and 14 of the conclusions of law.

We were largely borrowing verbatim from the finding of facts prepared by the able counsel for the defendant, but we entertained concepts from the words which were not the concepts given legitimately to them by the counsel of the defendant or by the members of the appellate court.

We engage in concept-creations. The judge of this court, when Attorney Gen-

eral of the state for nearly eight years, received releases of thousands of acres of land from leaseholders of the state against whom complaint had been made that there was want of reasonable development. Never for once was there the thought that the state had to accept or agree to the release. A release of the acreage held is the best proof of no want of exploitation.

It is with this logical concept firmly created in our mind, because of repeated impression and application through the years, that we gave great and controlling weight to the probative force of the releases by the defendant.

In a supplemental answer, just before trial, after having previously released 5760 acres of the total of 6000 acres held, the defendant said:

"Since that time, defendant has drilled a well on land adjacent to plaintiff's land which has been abandoned as a dry hole; and producing wells in the vicinity have begun to make large quantities of salt water, one of such wells having entirely ceased producing oil and having gone to producing 100% salt water; and, as a consequence of said facts, defendant has released and surrendered 160 acres of the above described 240 acres by filing with the Clerk and ex-officio Recorder of Cameron Parish a duly executed recordable surrender, so that defendant now holds under said lease only the northwest quarter of the northwest quarter of Section 27, being the 40-acre tract on which is located Coastal Club well No. 1, and northeast quarter of southeast quarter of Section 28, being the 40-acre tract on which is located Coastal Club well No. 2.

"Wherefore, defendant reiterates the prayer of its original answer and further prays that under no circumstances should its holding under said lease be reduced below the two 40-acre tracts still held thereunder."

There was a supplement to this supplemental answer, and we are quoting the whole paragraph: "In Article II of defendant's supplemental answer, it is averred that since the filing of this suit defendant drilled a well on land adjacent to plaintiff's which was abandoned as a dry hole. This statement is partially erroneous because the well referred to was drilled vertically to its objective sand without production and was, therefore, initially and at the vertical location a dry hole so that de-

fendant's statement was to that extent correct. However, the well was not then abandoned, but was plugged back and directionally drilled to a bottom hole location off vertical and was at said off-vertical bottom hole location completed as a producer. This averment is made to correctly state the situation fully to the Court."

The dry hole on adjacent land is reiterated, and though "the well was not then abandoned, but was plugged back and directionally drilled to a bottom hole location off vertical and was at said off-vertical bottom hole location completed as a producer," the release and surrender of the 160 acres is still ratified. If anything, the releases acquire stronger probative force than before because even in the face of the last supplemental answer with disclosure of better hopes for production, the release is still made.

So, in the instant case, the return of 5,920 acres out of 6,000 acres to the plaintiff was practically an absolution from the plaintiff's charge of want of exploitation of the 6,000 acres.

Then, when you have, additionally, two producing wells on the retained 80 acres, our judicial mind became immediately fixed with the natural consequent conviction that the testimony of the Shell experts, when compared to the equally credible testimony of the Coastal's experts, should prevail. That conclusion was that any further development by the Shell Company was not warranted.

We do say in our original opinion (a) at pages 821, 822 of 51 F.Supp.: "The eight wells that have already been drilled and that are now producing in the field are producing all the recoverable oil from the reservoir. This was supported by the evidence of the experts on both sides, and is pleaded by both parties. From the established premise that the wells in existence are capable of producing all of the oil in the field there follows indubitably the conclusion that the field as a whole has been adequately developed. Any additional wells would be unnecessary wells." (Emphasis ours.) (b) at pages 822, 823 of 51 F.Supp.: "From an examination and study of the testimony of Collett and Bates, experts for the plaintiff, and of Burpee, Craft and Torrey, experts for the defendant, it would seem that the Coastal Club lease originally had in place recoverable reserves of 624,000 barrels. But since the

same expert for plaintiff, Collett, calculated that between 849,000 to 870,000 barrels would be produced from Coastal Club No. 1, under existing conditions, the proof has been placed in the record by the plaintiff that Coastal Club lease will produce approximately 200,000 barrels of oil over and above that which the geological expert stated originally was in place available for production."

However, we do say, at page 821 of 51 F.Supp.: "If defendant has adequately developed, then the partial surrenders did not damage plaintiff and they constituted simply an expression by defendant that it felt the released acreage would not support a well and that it did not intend to drill on the released acreage, nor did it want to stand in the way of plaintiff trying to find some other operator to drill."

In our opinion on the merits of this case, we said (the only emphasized passage in the whole opinion), at page 821 of 51 F. Supp.: "We believe that the real issue between plaintiff and defendant is whether or not defendant has adequately developed the premises."

The mineral lease between the parties covered 6000 acres of land; just before suit was filed against it, the defendant released all of the acreage except 240 acres; during the pendency of the suit it released all the acreage except 40 acres around each of the two wells. This release by the defendant of 5920 acres out of a total of 6000 acres was the most controlling fact in the court's mind to cause it to believe that the defendant Company had adequately developed the property. How could it be otherwise?

We never did suspect that these releases were not absolutely binding under the law. The defendant Company had gone in the face of a complaint of want of adequate development and placed of record these releases in the alienation record of the parish of the situs of the property.

No mind will fail to be influenced by the controlling probative significance of the releases in this case when the question of reasonable exploitation is the issue. The theory that the releases were in fact and at law ineffectual cannot be mentally received and digested when that is the issue to be solved. It is impossible for the human mind to so work.

In the Civil Code of Louisiana, under Title IV, "Of Conventional Obligations," Chapter 5, "Of the Manner in Which Obligations May Be Extinguished," Section 3, "Of the Remission of the Debt," is found Article 2201, reading as follows: "The release or remission of a debt is presumed always to have been accepted by the debtor, and it can not be revoked by the creditor."

The Article has no counterpart in the Code Napoleon of 1804, does not appear in our Civil Code of 1808, first appears in our Code of 1825, and is found unchanged in our present code of 1870. Louisiana Legal Archives, Vol. 3, Part II, pages 1203, 1204. Its definitely mandatory language has been given full recognition and force by the Louisiana Supreme Court. Succession of Foerster, 1891, 43 La.Ann. 190, 9 So. 17. This case reviews the French commentators and refers to the earlier Louisiana decisions, all in accord. "We accept the conclusions of those who argue in its support, being more in accordance with our Civil Code, in which the subject of remission is more liberally treated." Succession of Foerster, supra, 9 So. at page 18, reaffirmed Hicks v. Hicks, 1919, 145 La. 465, 82 So. 415.

The contextual study of all the articles in Section 3, "Of the Remission of the Debt" (Articles 2199–2206), would indicate use of terms in general composition that might restrict their application to debt as represented by negotiable instruments.

■ However, since the Section is under "Conventional Obligations" in our Code, and this Section 3, "Of the Remission of the Debt" is found under Chapter 5, "Of the Manner in Which Obligations May Be Extinguished," we conclude that Article 2201 is applicable to the instant case, since we have here an obligation, and we are satisfied that the filing in the alienation records of the release of 5,920 acres of the 6,000 acres was meant as a remission of the debt owed by the Coastal to the Shell. Dufilho v. Bordelon, 152 La. 88, 92 So. 744; C. C. Art. 3556.

The court, at page 821 of its opinion in 51 F.Supp., quoted at length the position of the defendant. The second position given, (b), is as follows: "(b) the question of whether or not the lease permits of partial surrender is immaterial to the decision of the case; but in any event partial surrender is not prohibited by the lease after the delay rental payment period is passed."

We took the defendant at its word, and naturally felt that the partial surrenders as made by it were within its right and needed

no acquiescence from the plaintiff to be valid, and particularly since the rental payment period had passed, they were permitted and binding. The court never even thought of the necessity of any agreement to or acceptance by the plaintiff.

We still say this idea does not violate Item 13 of our conclusions of law: "The partial surrenders filed by defendant did not constitute an abandonment of the lease."

When we used the word "abandonment" in this Item 13, we meant that the defendant company was still on the premises, and working with the oil well and the gas well, and had not in the layman's acceptation of the word "abandoned" the lease.

We quote briefly from "Science of the Common Law," by Oliver Wendell Holmes*: "The very considerations which the courts most rarely mention, and always with an apology, are the secret root from which the law draws all the juices of life. We mean, of course, considerations of what is expedient for the community concerned. Every important principle which is developed by litigation is in fact and at bottom the result of more or less definitely understood views of public policy; most generally, to be sure, under our practice and traditions, the unconscious result of instinctive preferences and inarticulate convictions, but none the less traceable to public policy in the last analysis."

We shall seek to show the application of Justice Holmes' view to the instant case.

■ Basically, the principle as now contained in the opinion of the Circuit Court, is against public policy. A release should be a release; no acceptance is necessary; that is all. In our oil and mineral contracts, such must have been the practice. Consult the text-books and verify the dearth of litigation on the point; merely because the question is never even debated. Summers, Oil and Gas, Perm.Ed., vol. 3, ch. 17, Termination of Lease by Surrender, §§ 521–526. We find no case in Louisiana; La.Dig., vol. 13, Mines and Minerals.

Undesired and indecorous races to the alienation records by the dutiful competing attorneys should not be, during trial, temptingly induced and, again, at or near the close of the case, be made imperatively and practically necessary. Avoidance of this imposed practice on the profession should be the desideratum of the judiciary.

To require a lessor to accept the surrender of an oil and gas lease would place lessees or oil operators in a very precarious position. In the instance where a lessee is the obligee under a term lease, let us say for a primary term of ten years, and he no longer wishes to pay the annual rental and he should, before the rental due date, place of record a surrender of the lease, this surrender could not become effective under this theory without an acceptance.

If the lessor die and leave, say, only minor children as heirs, such minors could not accept unless the tutor, if they have one, should petition the court to permit them to accept the surrender.

Again, where no minors are involved and the sui juris lessor should choose not to accept the surrender or should prefer not to go to the trouble and expense of accepting a surrender, the lessee operator (usually an oil company) would never know when it is released from the payment of rental. Under the present holding, when the lessor has failed or refused to accept the surrender, what would keep the lessor from claiming and receiving the yearly rental every year for the full primary term of the lease?

We doubt that the present holding is tenable under the test of public and practical policy.

The recordation as an instrument affecting title to real estate in Louisiana in the alienation records of the parish of the situs of the property is strikingly legally meaningful.

Since 1910, through the leading case of McDuffie v. Walker, 125 La. 152, 51 So. 100, it was intendedly settled that: "* * * the question whether knowledge, possessed by a third person of a contract affecting immovable property should be considered, as far as such person is concerned, equivalent to the registry of the contract," should be answered in the negative.

The McDuffie v. Walker doctrine is predicated upon Article 2266 of the Civil Code of Louisiana, which says:

"All sales, contracts and judgments affecting immovable property, which shall not be so recorded, shall be utterly null and void, except between the parties thereto. The recording may be made at any time, but shall only affect third persons from the time of the recording.

"The recording shall have effect from

---

* Justice Oliver Wendell Holmes—His Book Notices, Uncollected Letters and Papers, edited by Harry C. Shriver.

the time when the act is deposited in the proper office, and indorsed by the proper officer."

For recent reaffirmation of this doctrine, see Chachere et al. v. Superior Oil Company et al., 192 La. 193, 187 So. 321.

■ An oil and mineral lease, or a royalty interest, is an interest in real property and is governed by the same rule as that which governs property rights. Jefferson v. Childers, 189 La. 46, 179 So. 30; Baird v. Atlas Oil Company, 146 La. 1091, 84 So. 366; Goldsmith v. McCoy, 190 La. 320, 182 So. 519; Angichiodo v. Cerami, D. C., 28 F.Supp. 720.

This reference to the significance and the legal implications of a recorded title in Louisiana is made to show that from a practical standpoint the present opinion of the Circuit Court presages serious business inconveniences, if not substantially prohibitive obstacles. In the instant case, to defeat the defendant the plaintiff had merely to lease the released acreage to a third party, who need not be innocent. So much for the impracticality of the present situation.

We say, however, with counsel for plaintiff, that there is actually, in logic, an acceptance of defendant's releases by the plaintiff's manner and time of refusal of the releases. How? (a) In relation to time, one release is made after complaint to defendant of want of reasonable development, and the second release, never formally offered, is executed and recorded after this suit based on the same complaint is actually filed. (b) By the persistent prayer, constant from the first until now, that the releases were a forfeiture of the contract. The sum of the pleading is—I refuse the releases but, through and because of them, the contract is forfeited.

The words of counsel express it better: "Let it be assumed that the cancellation, surrender of abandonment of an oil and gas lease, in whole or in part, must under the laws of Louisiana be accepted. The plaintiff used these surrenders as a sword with which to break the contract. That in itself is an acceptance of the surrender. It must follow that the revocation subsequently placed of record by defendant is invalid." See Shreveport Traction Co. v. Mulhaupt, 122 La. 667, 48 So. 144.

■ The defendant is estopped from revoking the releases.

The Circuit Court, because of our poorly-expressed language, laic instead of professional, could not, and did not, realize the great significance and deciding weight we gave to the releases. It concluded in its opinion that the releases were totally ineffectual—had no effect on the case whatsoever. The language we used said the same thing; our mind never said it, however. We assumed that the registry of the releases, so obviously timed to impress the lower court, would be fully noted.

To us the releases meant: "Coastal, you say I have not reasonably exploited. Why, here are 5920 of your 6000 acres back to you, to do with as you please. You may see surely now that there is nothing to be developed by the Shell."

We felt that: (a) if the contract were indivisible, then the releases were a forfeiture of the contract (paragraph 8), though not a full abandonment in the physical sense, as there were two wells on the unreleased 80 acres to be retained with five acres around each; (b) if the contract were divisible, then even in the case of proof of the adequate development of the 6000 acres, the releases were effective and irrevocable, because their probative force had won the victory for the defendant on the litigated point of adequate development.

Under (a) of the above paragraph, agreement with, not violence to, the principles of the cases of Murray v. Barnhart, 117 La. 1023, 1027, 42 So. 489; Cochran v. Gulf Refining Co., 139 La. 1010, 1019, 72 So. 718; Nabors v. Producers' Oil Company, 140 La. 985, 1002, 74 So. 527, L.R.A. 1917D, 1115, is the result.

The weaknesses of the words of the able counsel for the defendant in his circuit-court brief lie in the fact that the purposeful use made by the defendant of the probative force of the releases is overlooked. He says, to phrase it in popular parlance, "I have eaten my cake, but I must have it still."

The brief of defendant to this court now on the hearing on the matter of remand, says: "First, there was never any contest as to the adequate development of the 40-acre tracts on which the wells were situated. The complaint was that a well should have been drilled on one of the purportedly surrendered tracts. Therefore, the court could not have considered it

merely a question of adequate development of 80 acres."

That is so; we (everyone) did not restrict the question of reasonable exploitation to the lone, 80 acres retained by the defendant, but the question of reasonable exploitation was as to the whole 6000 acres. The evidence of both sides is solely on that issue. It is just on this very question for decision that the release and return of 5920 acres out of 6000 acres bears down so heavily that it practically leaves nothing to decide, when you have a well on each of the two remaining 40-acre tracts.

The court was told that there is another or an additional purpose of defendant in executing and recording the releases. Where there is the question of adequate and reasonable development, since the jurisprudence of Louisiana is that the court may enter a decree affording defendant a reasonable opportunity to conduct further development under such sanction as the court may provide (defendant so pleaded), the release of record of the 5920 acres of the 6000 acres excepted automatically the 5920 acres from such a permitted decree of directing further development. This protection to flow from the recordation of the releases accentuates, if it be possible, the probative force of the releases in proof of reasonable development and, further, in particular, asserts irrefragably their irrevocability.

We never thought of giving back the whole 6000 acres to the defendant. We doubt that anyone else did, either, before our opinion came out.

Unfortunately, our language to the Circuit Court was indeed poorly chosen, and it could, from our partly misleading facts and from our conclusions clothed in legally imprecise words, direct the court to let defendant get back its whole acreage, even though it had formally released 5920 acres of the total 6000 acres, and that, too, even if the defendant had been benefited by the unquestioned significance of the release.

We observed the demeanor and the conduct of the litigants—the two corporate entities being represented by their expert witnesses and their attorneys.

First, it was just generally admitted, as a first premise, that there was only one producing oil sand in the East Chalkley field—designated as "W" sand—this admission proffered by the Shell was admitted by the plaintiff, one may readily surmise, because it had no means to say anything else. If the Shell experts, through the intimate study of numerous wells in the area and its vicinity, in the course of years, entertained hopes, immediate or ultimate, of other oil sands, it necessarily said nothing as to "hopes". This was the first advantage to the Shell.

The second advantage of the Shell is that it held the other adjacent acreage. It had no selfish concern in the further development of plaintiffs' lands, because ultimately it would get all the oil available, irrespective of superficial ownership.

The third great and dominant advantage to the Shell in this case was the probative significance of its release of 5920 acres out of the 6000-acre lease when the question of reasonable exploitation of the whole 6000 acres was at issue.

In defendant's answer to Article 13, we find the effective pressure in the pleadings of the probative value of even the first release: "(c) That defendant tendered a partial release as alleged and that plaintiff refused it *and that defendant placed the partial release of record on February 19, 1942.*" (Italics ours.)

So, confronted by an equal number of plausible experts on both sides, coming to diametrically opposite conclusions, we, possessed of no special personal qualifications on the subject matter, had to select which set of experts to believe, not by consideration of the trustworthiness of the content of the evidence given by each side, for that, to us, sounded equally well, but by the third Shell advantage—the impelling power of its release of all of 6000 acres except 80 acres, on which latter acreage it had two producing wells.

What else could we say but that it had reasonably exploited, and that Conjectural Well No. 3 should not be bored by it?

In the back of our mind, we had the first two advantages enjoyed by Shell and because of the releases, so inextricably a part of the body and soul of the suit, we felt that, at least, five acres, or, at most, 40 acres, around each well should be left to it. It had not fully vacated the premises, so it should retain no more than five acres —but certainly never more than 40 acres, for we felt that was so, by the recorded releases, without the court having to say a thing.

If there had been no releases by the defendant, and the conclusion of the court,

after trial, was that there had been reasonable development, then the present judgment of the Circuit Court leaving the 6000 acres leased, the original contract untouched, would be correct.

The Circuit Court has to forgive us for having partly misconveyed the facts. It is only that we should be honest with ourselves, that we go to all this trouble. It is not to explain ourselves out of a reversal of our judgment.

We failed to have oral argument at the end of the trial; nor was there oral argument on the motion for a new trial. This was a serious mistake for the lower court. The slant of interpretation the case took in the appellate court was never presented to us. To us the great question was whether or not Conjectural Well No. 3 should be bored, dependent upon reasonable past exploitation.

We hope our superiors are patient and forgiving. It should be easy to sign the judgment as prepared and forget the case, but this would be neglect again. No, we must make our frank confession. And to think how hard we did work when this case was before us under a motion to dismiss for want of jurisdiction! See 45 F. Supp. 859. This is our third utterance.

This dutiful clarification by the trial judge will prevent varying suppositions to be made of the present circuit court holding, because of the want of sufficient facts. Now, its final ruling will be made the more exact and be quite definite.

We are told that we are wrong in the conclusion of five-acres-per-well restriction, paragraph 8 of original lease. We, having heard the case, knowing how much we yielded on the merits because of the release of 5920 acres out of 6000 acres, feel in justice that the alternative plea of the Shell should be accorded. Never did we dream the law was that Shell could reinvest itself with what it had divested itself of for a profit, for a deliberate purpose, and for an actual consideration received—the favorable decision.

Has the Circuit Court the power to reconsider and reshape its former opinion? Is there sufficient flexibility in "the interrelationship of judicial tribunals forming a hierarchical system" (Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 441, 84 L.Ed. 656) to permit the appellate court in the instant case to review and modify its former mandate upon the changed findings of fact by the lower court?

We must bear in mind what was said long ago by the Supreme Court in Sibbald v. United States, 37 U.S. 488, 491, 12 Pet. 488, 9 L.Ed. 1167: "When the supreme court have executed their power, in a cause before them, and their final decree or judgment requires some further act to be done, it can not issue an execution, but shall send a special mandate to the court below to award it. 24th sect. Judiciary Act [1 Story's Laws, 61]. Whatever was before the court, and is disposed of, is considered as finally settled. The inferior court is bound by the decree as the law of the case; and must carry it into execution, according to the mandate. They cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it upon any matter decided on appeal for error apparent; or intermeddle with it, further than to settle so much as has been remanded."

This is the general rule. Thornton v. Carter, 8 Cir., 109 F.2d 316, 320, and cases cited in footnote 4; Tyler v. Magwire, 84 U.S. 253, 287, 17 Wall. 253, 287, 21 L. Ed. 576, 583.

There have been exceptions, however, to this prevailing legal and logical rule about the law in the case. Notably, we find in the case of White v. Higgins, 1 Cir., 116 F.2d 312, at page 317, the following:

"The first question to consider is whether we should upon this second appeal reconsider our previous decision on section 219(g) and (h). The doctrine of 'law of the case' is not an inexorable command. It 'merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.' Messinger v. Anderson, 225 U.S. 436, 444, 32 S.Ct. 739, 740, 56 L.Ed. 1152; Cochran v. M & M Transportation Co., 1 Cir., 110 F.2d 519, 521; Johnson v. Cadillac Motor Car Co., 2 Cir., 261 F. 878, 883–886, 8 A.L.R. 1023; Brown v. Gesellschaft Fur Drahtlose Telegraphie, 70 App.D.C. 94, 104 F.2d 227, 228; Luminous Unit Co. v. Freeman-Sweet Co., 7 Cir., 3 F.2d 577, 580. Though the power exists to reopen the points of law already decided, it is a power which will necessarily be exercised sparingly, and only in a clear instance of previous error, to prevent a manifest injustice. The doctrine of law of the case is normally a salutary one

in the interest of economy of effort and of narrowing down the issues in successive stages of litigation. In the absence of exceptional circumstances, it would be unfortunate if on second appeal counsel felt free to argue de novo as a matter of course the points decided on previous appeal. See Great Western Telegraph Co. v. Burnham, 162 U.S. 339, 343, 344, 16 S.Ct. 850, 40 L. Ed. 991.

"When the doctrine of law of the case is being invoked in an intermediate appellate court, such as the Circuit Court of Appeals, another consideration enters. After we affirm a judgment on the ground that our decision on an earlier appeal has become the law of the case, the Supreme Court is nevertheless free to take the case on certiorari and reverse our judgment. Panama Railroad Co. v. Napier Shipping Co., 166 U.S. 280, 284, 17 S.Ct. 572, 41 L.Ed. 1004. The Supreme Court frequently does so. Western Union Telegraph Co. v. Czizek, 264 U.S. 281, 44 S.Ct. 328, 68 L.Ed. 682, reversing 9 Cir., 286 F. 478; American Surety Co. v. Greek Catholic Union, 284 U.S. 563, 52 S.Ct. 235, 76 L.Ed. 490, reversing 3 Cir., 51 F.2d 1050; Illinois Central R. Co. v. Crail, 281 U.S. 57, 50 S.Ct. 180, 74 L.Ed. 699, 67 A.L.R. 1423, reversing 8 Cir., 31 F.2d 111. Sometimes it does so even where application for certiorari to review our earlier judgment had been applied for and denied. Burnet v. J. Rogers Flannery & Co., 286 U.S. 524, 52 S.Ct. 497, 76 L.Ed. 1268, reversing, 3 Cir., 54 F.2d 365. Our law of the case is not the Supreme Court's law of the case. Our judgment on the second appeal stands or falls on its merits and has no improved standing before the Supreme Court from the fact that it resulted from an application of our law of the case. This being so, it would seem that if on second appeal we thought our earlier opinion was erroneous, we ought sensibly to set ourselves right, rather than to invite reversal above. But mere doubt on our part is not enough to open up the point for full reconsideration. Often when the decision is originally rendered we have doubts enough. We do the best we can, make our decision and pass on to something else."

We continue with circuit court cases along the same line. We refer your honorable court to the following cases: Johnson v. Cadillac Motor Car Company, 2 Cir., 261 F. 878, 8 A.L.R. 1023; Luminous Unit Co. v. Freeman-Sweet Co., 7 Cir., 3 F.2d 577, 580 ("establishes a practice which is contrary to the best interests of society"); Brown v. Gesellschaft Fur Drahtlose Telegraphie, M.B.H., 70 App.D.C. 94, 104 F. 2d 227, 228 ("it is true that the rule of the 'law of the case' would not prevent a different conclusion, if a clear case were presented showing that the earlier adjudication was plainly wrong and that application of the rule would work manifest injustice").

In the case of Cochran et al. v. M & M Transportation Co., 1 Cir., 110 F.2d 519, at page 521, we have: "The defendant moves to dismiss the appeal, chiefly on the ground that under our previous opinion and mandate the plaintiff is concluded from pressing any issues involving counts 1, 2 and 3. The doctrine of the law of the case is invoked. But that doctrine, like its twin brother stare decisis, is not an inexorable command, and must not be utilized to accomplish an obvious injustice."

We are happy to note that the tolerance of Mr. Justice Holmes responded favorably to make an exception to this general rule in the case of Messinger v. Anderson, 225 U.S. 436, 32 S.Ct. 739, 740, 56 L.Ed. 1152: "In the absence of statute the phrase, 'law of the case,' as applied to the effect of previous orders on the later action of the court rendering them in the same case, merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power."

We never did conceive that the contract was indivisible in the sense that in an interpretation of it upon the question of whether or not there was reasonable exploitation, the release of 5920 acres out of 6000 acres in proof of reasonable exploitation of the lease was revocable by the lessee after the lessee had profited by the impelling probative force of his act of release.

It would be easy in fact, and it is to a degree quite tempting, to sign the judgment as prepared by the defendant, but there would remain our conscience, troubled in the realization that the truth has not been fully told, and that likely an injustice has been done. Though the result of the case might not be changed, there would still be fruit to come from the honest disclosure, in that the significance and reach of the jurisprudence that this case might establish would certainly be affected and limited.

The case of Ohio Oil Co. et al. v. Thompson, 8 Cir., 120 F.2d 831, in the discussion in Headnote (1), filled us with the conviction that perhaps in making frankly these conscientious avowals, we are following our path of duty.

So, we now leave to the discretion and conscience of our Circuit Court whether or not its power will be exercised in changing its former expression on the law of the case.

The case of Gaines v. Caldwell, 148 U.S. 228, 13 S.Ct. 611, 615, 37 L.Ed. 432, decided in 1893, is neither too old nor too young, and is quite rehearsive of the jurisprudence on the point as to how commanding the mandate of the Circuit Court is to the District Court. It shows that there are exceptions to the general rule. We make a quotation from it (148 U.S. 228, 13 S.Ct. at page 615, 37 L.Ed. at page 435): "Obeying the mandate of this court, and proceeding in conformity with its opinion, in the present case, were not matters within the discretion of the circuit court; and therefore *the cases which hold that this court will not direct in what manner the discretion of an inferior tribunal shall be exercised do not apply to the present case."* (Emphasis ours.)

Is there any discretion of this inferior tribunal to be exercised in the instant case?

The reading of the case raises the question as to just how much discretion we have in the sake of justice, and further, just what discretion we have under the per curiam of the Circuit Court on the petition for rehearing, 142 F.2d 245, particularly stressing the last sentence from the per curiam: "It was not intended to, it did not, prevent the appellee from making the releases effectual by accepting them."

The instant case is to be differentiated from the case of Ex parte Dubuque & P. R. Co., 1 Wall. 69, 17 L.Ed. 514, because in that case the court below had thereafter received affidavits showing new facts, and granted a new trial.

The per curiam before us in the instant case, 142 F.2d 245, reads as follows: "Movant is in error in its assumption that the opinion was intended to, or did, have any effect other than an adjudication that the judgment was wrong and ought to be reversed and sent back for further proceedings not inconsistent with it, and when the judgment is entered on the opinion, it will be so ordered."

No "effect other than an adjudication that the judgment was wrong * * * reversed and sent back for further proceedings not inconsistent with it" is the mandate of our superiors.

When we rule herewith that the acreage left to the defendant is not the original 6000 acres, but only the 80 acres retained by it, we are ruling that our former judgment was wrong, we are likewise being reversed, we are proceeding further, and we are not being inconsistent with the mandate given us. So much for this phase.

And now this court of original instance, legally organized and empowered as the sole origin for the declaration of judgment, charging itself with the same facts as heretofore, but now restated in language so definite that mutuality of concept by the two courts is inescapable, now adjudges the two 40-acre tracts instead of the two five acres to the defendant.

■ Since we are the orginal fount of decision, we believe that we should, in justice, at least give judgment allowing the defendant to retain only 40 acres around each of the two wells. We come to that ruling, reaffirming our former main conclusion that there was reasonable exploitation, but that conclusion is accompanied with the logical practical necessity that the released 5920 acres of the 6000 remain where returned. We cannot reaffirm our former conclusion of reasonable exploitation using the fact of the releases to reach it, and then blandly and illogically associate that conclusion with the return of the released acreage.

■ There must be some logical merit in this position, because on the motion for rehearing on the Circuit Court's opinion, the Circuit Court said, 142 F.2d 245:

"The statement in the opinion * * *: 'As the matter stands, therefore, * * * the situation is as if no partial releases had been executed and placed of record' had reference to the situation as it existed at the entry of the judgment appealed from. *It was not intended to, it did not, prevent the appellee from making the releases effectual by accepting them."* (Emphasis ours.)

The good sense and the keen conscience of the honorable court were touched and it said that the first release, though expressly refused by the plaintiff, could be yet or at any time accepted. The second recorded release was not formally refused.

On the second phase, when we hold that this case is still alive and that the appellee is still within time to make the releases of the plaintiff effectual by accepting them, we are following not only literally, but substantially, the command of the latter part of the per curiam afore quoted. We are following the applicable law, too: "The cancellation is a fait accompli, and has passed to the state of an absolute presumption of release," Succession of Foerster, supra, 9 So. at page 19, "* * * and it cannot be revoked by the creditor." Art. 2201, C.C.La.

As a citation to apply to the support of the reasoning in the above paragraph, we offer the case of Supervisors v. Kennicott, 94 U.S. 498, 499, 24 L.Ed. 260. From it we make the following quotation: "* * * for it is settled in this court, that whatever has been decided here upon one appeal cannot be re-examined in a subsequent appeal of the same suit. *Such subsequent appeal brings up for consideration only the proceedings of the Circuit Court, after the mandate of this court."* (Numerous cases cited; emphasis ours.)

Also, the case of Electrical Research Products, Inc., v. Gross, 9 Cir., 120 F.2d 301, shows that an appellate court, in the exercise of its own discretion, may revoke one of its supposedly previous conclusions of law, because under Headnote (14) at page 308 of 120 F.2d, is found: "Here again it is urged that the law of the case has been violated. Appellant refers to the discussion of the measure of damages, 86 F.2d page 930 [infra]. Obviously, the discussion is dictum. And if it be construed as denying the right to recover lost profits in a case of this kind, we think it was ill-advised and should not be followed."

The title of the case in 86 F.2d 925, 930, is exactly the same as the title in the case at 120 F.2d 301; this is mentioned in order to show that the two cases were between the same parties.

We now declare and adjudge that this per curiam decree of the circuit court remains and is the continuing status as long as this case be extant. This case is still alive and the hand of the defendant must be stopped, when it files a premature withdrawal of its releases.

Where defendant has hastened and has acted, plaintiff by its very pleadings and legal contentions may not hasten nor act. The want of equal opportunity is obvious.

■ Also, and nevertheless, there is the mental reverse turn: plaintiff's very contention that there was a forfeiture of the lease contract by and through the releases is a full and judicially-pleaded acceptance of the releases. So, there can be no revocation, for the offer has been accepted.

We are now grading them as offers; that is very charitable to the defendant, for note their definite and solemn declarations: "Now, Therefore, Know All Men By These Presents, that Shell Oil Company, Incorporated, does hereby release, relinquish, and surrender unto the abovenamed Lessor, its successors and assigns, said lease as amended and all right, title and interest of Shell Oil Company, Incorporated, thereunder, insofar, but only insofar, as same covers and affects the following described property."

If the lower court does not modify (though it has the power) its previous conclusions of law, because of our modified finding of facts, here is the inviting juncture in the case where the substantial justice that should apply may be allowed. In case the plaintiff were to be permitted to accept the releases and it did, and the attempted revocation of them by the defendant was set aside, the same result of 40 acres at each well would be attained.

All the argument we have heretofore made, using the force of C. C. Art. 2201 as authority, if futile to cause the appellate court to change its opinion, is very applicable to our present contention that the releases are definite and irrevocable, do not need plaintiff's acceptance, and that the attempted revocation is not legally permissible and should be set aside.

If this court were to sign the prepared judgment presented to it by the defendant, without more, remaining silent on the question of the legality of the attempted revocation filed by the defendant during the life of the case, which question has been formally and timely urged by the plaintiff, the issue would become res adjudicata. The hearing for plaintiff is now or never.

Thus, we present the case to our worthy superiors of the appellate court. We failed originally to make ourselves clear. There is no criticism of the appellate court's decision made according to the lights afforded it. Now, our duty is done.

We shall sign judgment upon presentation reversing our previous judgment in the following particulars: (1) let the two

40-acre tracts, described as follows: NE¼ of SE¼ of Section 28 and the NW¼ of NW¼ of Section 27, remain with the defendant; (2) otherwise all the other acreage of the remaining 6000 to be free of the lease of defendant; and (3) further, or alternatively, that the judgment shall decree that this suit is still extant, and, consequently, in compliance with the per curiam decree of the Circuit Court herein the plaintiff is not and shall not be prevented "from making the releases effectual by accepting them," and accordingly, that the recordation of this judgment shall serve as a cancellation of the revocation filed by defendant; and (4) finally, that the plaintiff and defendant shall each pay one-half of the total costs of this suit, except that each litigant is to pay his own expert witnesses.

## On Motion for New Trial.

In this matter the court has now before it a motion for a new trial filed by the defendant, the Shell Oil Company, Incorporated; the court therein being asked for an order setting aside the judgment entered on August 7, 1944, and granting a new trial, for the following reasons:

1. The court erred in refusing to enter a judgment for defendant upon defendant's motion for judgment, such refusal being contrary to the mandate of the Circuit Court.

2. The court erred in permitting plaintiff to file a supplemental petition and the exhibits attached, and in proceeding to consider the case, such action being contrary to the same mandate.

3. The court erred in entering a final judgment when the matter was pending before the court on defendant's motion for judgment on the mandate. Such action deprived the defendant of the opportunity of answering plaintiff's supplemental petition and of offering such evidence as it desired.

4. The court erred in holding the purported partial releases to be effective and in ordering canceled the instrument recalling and revoking the purported partial releases.

5. The judgment entered herein was contrary to the law and the evidence.

6. The court erred in dividing the costs and in not taxing all costs against plaintiff.

Then in the alternative and in the event the court did not enter an order granting a new trial generally, mover moves the court for an order granting a new trial for the limited purpose of permitting the defendant (a) to file its answer to plaintiff's supplemental petition, and (b) to offer and introduce in evidence a letter or order of the Petroleum Administration for War dated August 11, 1943.

By letter, dated August 18, 1944, ten days before the hearing on the motion for new trial, the court advised both attorneys as follows: "Please be prepared to present your motion for a new trial, and also to try the issue of the supplemental petition and your answer thereto."

We shall now dispose seriatim of the points presented in the motion for a new trial.

For our ruling on point 1, we reiterate the full opinion filed by us on July 20, 1944; it is denied.

For our ruling on point 2, we reiterate the full opinion as filed by us on July 20, 1944; it is denied.

On point 3, the defendant is correct and we do grant the present motion for a new trial to allow the defendant the opportunity of answering plaintiff's supplemental petition and of offering such evidence as it may desire. As stated above, notice of ten days in order to prepare was given to the defendant. No additional time has been requested by it. It filed formally its "Answer to Supplemental Petition Filed on Remand" and the acceptance of evidence of any character was offered. Trial was had on the issue; the plaintiff had the same opportunity.

The ruling on this new trial granted will be found hereinbelow when the issue on the supplemental petition and answer filed on remand is considered.

For our ruling on point 4, we reiterate the full opinion filed by us on July 20, 1944; it is denied.

For our ruling on point 5, we reiterate the opinion filed by us on July 20, 1944; it is denied.

On point 6, our answer is that if defendant in proving its case of reasonable exploitation had not released 5920 acres of the 6000 acres of the area involved and the court then had ruled that there was a reasonable exploitation, the total costs would have had to be borne by the plaintiff; but when the defendant filed its releases of almost the total acreage, we respectfully urge that, firstly, it was a forfeiture of the original contract, and our first opinion should

have been left alone, but at least, secondly, since the releases under our opinion of July 20, 1944, were irrevocable, or even if considered as an offer subject to an acceptance, were accepted by the plaintiff through its legal contention in the pleadings; the case characterizes under that part of Rule 54(d), Rules of Civil Procedure, 28 U.S.C.A. following section 723c, "* * * unless the court otherwise directs", as one wherein the discretion of the trial court may be exercised. Consequently, for these reasons and for any other contained in the opinion of July 20, 1944, we deny the point.

Besides the above reason, there are two others: (a) the advantage to Shell in the stipulation that there was only one producing sand in the field, and (b) the advantage to Shell in its ownership of all the immediately adjacent acreage.

So, the motion for a new trial on the matter of remand, generally, is denied.

In the following language of the alternative pleading of the defendant, the Shell Oil Company: "* * * in the event the court will not enter an order granting a new trial generally", we think it possible that an unwarranted injustice to it might be inferred. Our invitation for any and all evidence under point 3 is the refutation of the inference. We did not err under point 3 as alleged. Our opinion of July 20, 1944, and the judgment thereunder are not final— the best proof of that is that we are considering now this motion for a new trial. The rules provide for a motion for a new trial; the period therefor is ten days after the signing of judgment. Rule 59(b). No newly-discovered evidence is alleged; the letter or order of the Petroleum Administration for War dated August 11, 1943, which the court now permits into the record, should have been offered by the defendant during the course of the regular trial, as its pleadings particularly provided by direct mention. See the last paragraph of the Answer. Our view is that all the new trial that defendant wants is being accorded it now, except of course the type which is alleged in points 1 and 2 of its motion. These are definitely and clearly refused for the reasons given.

So, we have permitted the answer by defendant to plaintiff's supplemental petition. We have permitted the letter of the Petroleum Administration for War dated August 11, 1943. No further evidence was offered by the defendant company, and the plaintiff filed its evidence.

We shall now rule on the issue of the supplemental petition and answer.

From the language of the Supplemental Petition on Remand and the answer to it, it is, in Articles 1 to 3, inclusive, a presentation again of the motion for a new trial. This portion of the issue is answered and ruled upon by our opinion of July 20, 1944. The plaintiff prevails on these three articles; the previous judgment encompasses the finding.

As to Article 4 of the petition, and the Answer to Supplemental Petition Filed on Remand, considering the evidence and the law applicable, we rule for the plaintiff, sustaining its allegations. Our reasons are found in the opinion of July 20, 1944. The judgment already signed contains the proper decree on this point.

As to the issue in Article 5, considering the evidence and the law applicable, we rule for the plaintiff, sustaining its allegations, and particularly rule against the defendant in its allegation "* * * that the legal status and effect of the purported surrenders have been decided and passed upon by the Circuit Court of Appeals, which decision is binding on this Court." Our reasons are found in the opinion of July 20, 1944; the judgment already signed contains the proper decree on this point.

As to the issue in Article 6, considering the evidence and the law applicable, we rule for the plaintiff, sustaining its allegations, and particularly rule against the defendant in its allegation "* * * that the status or legal effect of the purported partial surrenders and the right of defendant to withdraw same have already been determined by the Court of Appeals."

As to the issue in Article 7, considering the evidence and the law applicable, we rule for the plaintiff, sustaining its allegations. The defendant merely denies the soundness of the legal conclusions of Article 7. Our reasons are found in our opinion of July 20, 1944. The judgment already signed contains the proper decree on this point.

█ Incidentally, the fixing of 40 acres around each well by us in our last decree is based on the releases by Shell placed in the alienation records, and, as the opinion will show in its reasoning, has nothing to do with the United States War Production Board orders as to the necessary acreage (40) for oil exploitation around each well. The figure of 40 is purely coincidental; no connection is made by us whatsoever be-

tween the two. Similarly, the United States War Production Board order requiring 320 acres around a gas well has nothing to do with the conclusion in our opinion of July 20, 1944, nor with the reasoning for reaching it. So, fundamentally, we rule that the legal effect of the releases by the Shell is that the Shell's plan, later, during August, 1943, of forming a pool for the production of gas, using four of its other wells for possible discovery of gas in connection with Coastal Well No. 2, allegedly proved by the letter to the Shell by the Deputy Petroleum Administrator, dated August 11, 1943, and allegedly legally authorized by Ex. Orders 9024, 9040, 9125 and 9276, and Directive No. 30 of the War Production Board, is barred from consideration because immaterial and irrelevant.

The irrevocable act of release of all the acreage of the lease except 80 acres estops the Shell from this later venture, involving more than the 80 acres retained by it.

 Pretermitting the above definite bar, for the sake of argument, we shall proceed. Shell's probable contention is that under its contract for exploitation it developed two wells, one of oil and the other of gas, and that as the natural benefit from its spending a substantial sum of money in particular connection with the gas well (for as to the oil well, it has the 40 acres by our decision—the acreage required by the Deputy Petroleum Administrator), it should have the right now to select "at least 320 contiguous productive areas" (sic) *acres* to Coastal Well No. 2 from the originally leased 6000 acres and to proceed, to the mutual benefit of both parties-litigant, to run gas from Coastal Well No. 2.

Compare the dates of the two releases (all except 240 acres on February 4, 1942; then 160 acres out of the 240 acres, leaving 40 to each of the two wells, in September of 1942) to the Executive Orders (No. 9024 on January 16, 1942; No. 9040 on January 24, 1942; No. 9125 on April 7, 1942; and No. 9276 on December 2, 1942) and the Directive (dated August 21, 1943). Though Ex. Order No. 9276 (December 2, 1942) and Directive No. 30 (August 21, 1943) are subsequent in time to the last release of acreage by Shell (September of 1942), the inference is readily made that since the other three Executive Orders are prior to the last release, and all the four orders grow one from the other by specific mention, the Shell was fully aware of the existence of war and of the critical necessity of oil and gas to the war effort when it released the acreage. Therefore, it is equitably estopped by its actual knowledge of the import of the acts.

Moreover, the acreage may be furnished by the plaintiff now as well as by the Shell, in any manner of pooling, and the nation will miss nothing. So the patriotic appeal lacks application.

As another point, an examination of the ownership map discloses that the Coastal Farms and Ranch, Incorporated (totally dissociated from the Coastal Club, Incorporated), owns equally as much of what is "contiguous" acreage as the Coastal Club, Incorporated, does. So, in the satisfaction of the Government requirement, the Shell would still have to deal with another than the Coastal.

Again, there is no evidence in the record to show that Shell has made any request of the Coastal Club, Incorporated, or of the Coastal Farms, or of any one, for the utilization of lands to make the 320-acre gas unit.

Moreover, and most importantly, the Shell, formerly the leaseholder of the minerals of this contiguous acreage of the Coastal Farms and Ranch, Incorporated, released the acreage it held from the Coastal Farms, on December 3, 1942, and placed this fact in the record of this case. Defendant Exhibit 30, Note of Evidence, pp. 357, 358. The probative force was that an additional and corroborative proof of adequate exploitation of the 6000-acre lease was put into the case, since it showed release not only of 5920 acres of the original 6000 at issue, but even the release of extensive immediately adjacent acreage to the west of the Coastal Club lease.

Furthermore, there is no showing that the defendant made any application to the Conservation Commission, or to the Department of Minerals, in the State of Louisiana, under applicable laws, to force the Coastal Club or any one else to enter into a unitization or agreement to furnish acreage for a 320 acre unit.

Accordingly, therefore, after the full trial had on the supplemental petition and answer filed on remand, we find for the plaintiff. Our previous opinion of July 20, 1944, and the ensuing judgment are affirmed.

What we said in the case of Williams v. James, D.C., 34 F.Supp. 61, at page 69, we think is quite applicable in this case: "The

opinion of the district court is subject to affirmance or reversal. Such opinion, consequently, is permitted to have a variety of grounds, consistent or inconsistent, concomitant or alternative, to support itself. Final acceptance or rejection of one or more of the grounds is left to the appellate court. The final appellate court declares the one and final ruling, reaching a definiteness of grounds. Accordingly, in this opinion is offered variety of support for the final conclusion. There is that courteous facility, which one sees when the learning apprentice places at hand for the ready use of his master the various materials and tools which might be used at the work."

Finally, we discover that, through inadvertence, our judgment should have added thereto the following paragraph:

It is further ordered, adjudged and decreed that plaintiff's claim for damages in the sum of $36,000 and for attorneys' fees in the sum of $2000, be and they are hereby denied.

Judgment will be signed accordingly.